# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,                )
                                         )   Case No. 2:17-cr-00086-HDM-NJK
        Plaintiff,                     )
                                         )   REPORT AND RECOMMENDATION
vs.                                      )
                                         )
ANTHONY DELANO HYLTON, JR.,              )
                                         )
        Defendant.                     )
_____  )

    This matter was referred to the undersigned Magistrate Judge to conduct an evidentiary hearing in connection with Defendant Anthony Delano Hylton, Jr.'s motion to reconsider the Court's order denying his previous motion to suppress.

## I.   PROCEDURAL HISTORY

    On March 8, 2017, a complaint was filed charging Defendant with two counts of armed bank robbery, in violation of Title 18, United States Code, Sections 2113(a) and (d) and two counts of use of a firearm in a crime of violence, in violation of Title 18, United States Code, Section 924(c)(1).  Docket No. 1.

    On March 21, 2017, a federal grand jury sitting in Las Vegas, Nevada issued an indictment charging Defendant with two counts of armed bank robbery, in violation of Title 18, United States Code, Sections 2113(a) and (d) and two counts of use of a firearm in a crime of violence, in violation of Title 18, United States Code, Section 924(c)(1).  Docket No. 8.

On October 3, 2017, a federal grand jury sitting in Las Vegas, Nevada issued a superseding indictment charging Defendant with two counts of armed bank robbery, in violation of Title 18, United States Code, Sections 2113(a) and (d); two counts of use and carry of a firearm during and in  relation to a crime of violence, in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii); and one count of felon in possession of a firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).  Docket No. 30.

On October 19, 2017, Defendant filed a motion to suppress evidence.  Docket Nos. 36, 38. On November 15, 2017, after considering Defendant's motion, the United States' response, and Defendant's reply, the undersigned recommended denial of Defendant's motion to suppress evidence.  *See* Docket No. 45.

On December 4, 2017, Defendant objected to the Report and Recommendation.  Docket No. 50.  On December 6, 2017, the United States responded to Defendant's objection.  Docket No. 51.  On December 20, 2017, United States District Judge Howard D. McKibben adopted the Report and Recommendation and denied Defendant's motion to suppress.  Docket No. 52.  Defendant then filed a motion to reconsider Judge McKibben's order, to which the United States responded, and Defendant replied.  Docket Nos. 54, 59, 65.  On January 29, 2018, Judge McKibben denied Defendant's motion to reconsider.

On June 4, 2018, Defendant filed a second motion to reconsider the order adopting the Report and Recommendation and requested an evidentiary hearing.  Docket No. 99.  The United States responded and Defendant replied.  Docket Nos. 103, 104.  On June 29, 2018, Judge McKibben denied Defendant's motion.  Docket No. 105.  On the same day, after the Court's order, Defendant filed a supplement to his reply.  Docket No. 106.  In his supplement, Defendant

1  submitted the Computer Aided Dispatch (CAD) report relating to the stop of his vehicle which, he

2  submitted, he did not have in his possession until May 8, 2018. *Id*. at 2 n. 1.

3      On September 5, 2018, Defendant filed his second motion to reconsider the order denying

4  his motion to suppress. Docket No. 124. The motion requests reconsideration and an evidentiary

5  hearing to resolve issues presented by the CAD. *Id*. On September 10, 2018, Judge McKibben

6  vacated his prior orders denying Defendant's request to reconsider his order denying the motion

7  to suppress. Docket No. 136. Judge McKibben granted Defendant's motion at Docket No. 124

8  for the limited purpose of conducting an evidentiary hearing before the undersigned, "solely on

9  the issue of the time frame of the detention of the Defendant after he was discovered in the Las

10 Vegas intersection." *Id*. Specifically, Judge McKibben ordered that the hearing would be limited

11 to the duration of the detention and, based upon the facts generated as a result of the CAD, whether

12 that period of time was reasonable. *Id*.

13     On September 11, 2018, the undersigned issued an order setting an evidentiary hearing,

14 limited to the topics as ordered by Judge McKibben. Docket No. 137. On September 20, 2018,

15 the parties appeared before the Court for the evidentiary hearing. Docket No. 146.

16     On October 11, 2018, the undersigned ordered the parties to file supplemental briefing

17 regarding the evidentiary hearing. Docket No. 156. Specifically, the Court ordered the parties to

18 address, with appropriate authority and citations, "the proper remedy if the Court finds that the

19 duration of detention was unreasonably prolonged beyond the completion of the Field Sobriety

20 Tests." *Id*. at 1-2. Both parties complied. Docket Nos. 159, 160.

21     The United States submits that, even if the Court finds the stop was unreasonably

22 prolonged, the firearm was found in Defendant's car pursuant to a valid search long before the

23 prolongation and, therefore, it is not fruit of the poisonous tree and should not be suppressed.

Docket No. 159 at 2, 4.  The United States submits that the only thing that should be suppressed if the Court finds the stop was unnecessarily prolonged is any evidence found after the unnecessary prolongation, including statements Defendant made regarding his ownership of the firearm.  *Id*. at 4.  Finally, the United States submits that the "body or identity of a defendant … in a criminal … proceeding is never itself suppressible as a fruit of an unlawful arrest" and, therefore, the fact that Defendant was the individual contacted during the stop is not subject to suppression even if the Court finds the stop was unnecessarily prolonged.  *Id*. at 5.

Defendant submits that, although the firearm was legally discovered prior to the unreasonable prolongation, officers did not determine that Defendant was a convicted felon until after the unreasonable prolongation of the stop.  Docket No. 160 at 2-3.  Defendant submits that, if the officers had ended the detention after the Field Sobriety tests, he "would likely have been cited for some traffic violation and allowed to go home."  *Id*. at 4.  Defendant submits that testimony about the firearm and its location in the car is proper, but that the United States has failed to demonstrate that Defendant's criminal record would have been run but for the unreasonable prolongation.  *Id*.  Defendant, therefore, suggests that Defendant's prior felony conviction is a direct result of the unreasonable prolongation of the traffic stop.  *Id*.  Defendant submits that none of the exceptions to the exclusionary rule applies and, thus, asks the Court to suppress the illegally-obtained evidence consisting of Defendant's prior conviction.  *Id*. at 4-5.

## II.    FACTS ADDUCED AT EVIDENTIARY HEARING

### A.    Testimony of Officer Hinkel[1]

On December 5, 2016, Las Vegas Metropolitan Police Officer Patrick Hinkel assisted Officer Brennan Childers in a traffic stop wherein Defendant was found sleeping in the driver's seat of a vehicle in the intersection of Flamingo and Jones in Las Vegas, Nevada. Hearing Tr. (9/20/2018) at 10:11 – 10:12 a.m., 10:20 a.m. Officer Hinkel was dispatched to this location because of a call that came in about the vehicle. Hearing Tr. (9/20/2018) at 10:20 a.m. The CAD shows that the call came in at 6:02 a.m., and that Officer Hinkel arrived on the scene at 6:13 a.m. Hearing Tr. (9/20/2018) at 10:22 a.m. Officer Hinkel parked behind Defendant's vehicle and Officer Childers parked in front of it to block the vehicle in. Hearing Tr. (9/20/2018) at 10:22 a.m. The weather was cold that day. Hearing Tr. (9/20/2018) at 10:24 a.m.

Officer Hinkel got out of his car and walked toward Defendant's vehicle. Hearing Tr. (9/20/2018) at 10:23 a.m. Officer Childers approached the driver's side of the vehicle, and Officer Hinkel approached the passenger side. Hearing Tr. (9/20/2018) at 10:23 a.m. All of the windows on Defendant's vehicle were raised; however, Officer Hinkel noticed the smell of raw marijuana emanating from the vehicle. Hearing Tr. (9/20/2018) at 10:23 a.m.

Officer Childers knocked on the window of the vehicle and was able to awaken Defendant. Hearing Tr. (9/20/2018) at 10:24 a.m. Officer Childers asked Defendant to exit the vehicle, which he did. Hearing Tr. (9/20/2018) at 10:24 a.m. Defendant walked to the back of his vehicle, at which time Officer Hinkel had an opportunity to interact with him. Hearing Tr. (9/20/2018) at 10:24 a.m. During this interaction, Defendant's clothes were not disheveled, he was properly

---

[1] **Error! Main Document Only.**Citations to the recording of the hearing are noted by "Hearing Tr." followed by the relevant date and time of the hearing.

1    dressed, his eyes were not bloodshot, and he responded to questions posed to him by the officers.

2    Hearing Tr. (9/20/2018) at 10:24 a.m., 10:28 – 10:29 a.m.

3          According to the bodycam footage, within five minutes of the stop, Defendant stated that

4    his driver's license was in the back of his vehicle.   Hearing Tr. (9/20/2018) at 10:30 a.m.   Officer

5    Hinkel entered Defendant's vehicle to retrieve his driver's license because Defendant stated that

6    his license was in the back of the vehicle, though Officer Hinkel did not ask Defendant if he could

7    enter the vehicle to retrieve the identification.   Hearing Tr. (9/20/2018) at 10:25 a.m., 10:30 a.m.,

8    10:33 a.m.   Officer Hinkel also testified, however, that he conducted a search of Defendant's

9    vehicle because the car smelled like marijuana.   Hearing Tr. (9/20/2018) at 10:14 a.m., 10:34 a.m.

10   Officer Hinkel did not find any marijuana in the vehicle. Hearing Tr. (9/20/2018) at 10:23 a.m.

11         In the backseat of Defendant's vehicle, Officer Hinkel located a backpack and a black hard-

12   sided case, both of which he opened.   Hearing Tr. (9/20/2018) at 10:14 a.m., 10:31 a.m.   When

13   Officer Hinkel first saw the case, he recognized it as a case that often contained firearms, so he

14   opened it to determine if a firearm was inside it.   Hearing Tr. (9/20/2018) at 10:15 a.m., 10:32 a.m.

15   Inside the case, Officer Hinkel found a firearm.   Hearing Tr. (9/20/2018) at 10:33 a.m.   Officer

16   Hinkel removed the firearm case, with the firearm in it, from Defendant's vehicle and secured it

17   in his own vehicle.   Hearing Tr. (9/20/2018) at 10:15 a.m.   At this time, Officer Hinkel did not

18   know whether Defendant had any prior convictions.   Hearing Tr. (9/20/2018) at 10:34 a.m.

19         After securing the firearm in his vehicle, Officer Hinkel returned to Defendant's vehicle

20   and searched it.   Hearing Tr. (9/20/2018) at 10:34 a.m.   Officer Hinkel found a Sprite bottle on the

21   front floorboard of Defendant's vehicle that contained liquid with an orange tint.   Hearing Tr.

22   (9/20/2018) at 10:16 a.m.   He also found crushed pills on the floorboard.   Hearing Tr. (9/20/2018)

23   at 10:16 a.m.   After searching Defendant's vehicle, Officer Hinkel returned to his vehicle and

1  called into dispatch to check the serial number of the firearm to determine if it was stolen or had a

2  hit on it – his check was negative.  Hearing Tr. (9/20/2018) at 10:17 – 10:18 a.m., 10:35 a.m.

3      At this time, Officer Hinkel did not know anything about Defendant's identity; in fact, he

4  had not yet asked Defendant for his name or date of birth.  Hearing Tr. (9/20/2018) at 10:35 a.m.

5  Officer Hinkel had not attempted to run a record or warrant check on Defendant.  Hearing Tr.

6  (9/20/2018) at 10:35 a.m.  Nonetheless, Officer Hinkel ran a check on the firearm.  Hearing Tr.

7  (9/20/2018) at 10:35 a.m.

8      During this time, both Officer Childers and Officer Hinkel believed Defendant was under

9  the influence of marijuana.  Hearing Tr. (9/20/2018) at 10:36 a.m.  As a result, at about 6:27 a.m.,

10  Officer Childers ran Defendant through field sobriety tests.  Hearing Tr. (9/20/2018) at 10:36 a.m.

11  When the field sobriety tests were over, Officer Childers came to Officer Hinkel's car to speak

12  with him.  Hearing Tr. (9/20/2018) at 10:36 a.m.  At approximately 6:32 a.m., Officer Childers

13  told Officer Hinkel that "this is not an under the influence possession type thing."  Hearing Tr.

14  (9/20/2018) at 10:36 – 10:37 a.m., 10:38 – 10:39 a.m., 10:41 a.m.

15      At that point, Officer Hinkel testified, he and Officer Childers were "both leaning more

16  towards" the belief that Defendant was not impaired.  Hearing Tr. (9/20/2018) at 10:37 a.m.

17  Nonetheless, they engaged in a discussion about a Drug Recognition Expert (DRE).  Hearing Tr.

18  (9/20/2018) at 10:47 – 10:48 a.m.  Officer Hinkel testified that he and Officer Childers believed

19  Defendant was under the influence of "something," just not alcohol.  Hearing Tr. (9/20/2018) at

20  10:48 a.m.  Bringing a DRE to the scene would entail waiting for the DRE to arrive, become

21  familiar with the facts, and test Defendant.  Hearing Tr. (9/20/2018) at 10:49 a.m.  At 6:46 a.m., a

22  DRE was en route to the scene.  Hearing Tr. (9/20/2018) at 10:52 a.m.  Approximately three

23  minutes later, the DRE was disregarded. Hearing Tr. (9/20/2018) at 10:52 a.m.

1    Officer Childers did not ask Defendant for his name until approximately 6:40 a.m.  Hearing

2  Tr. (9/20/2018) at 10:45 a.m.  Neither officer cited Defendant for being impaired or for obstructing

3  traffic.  Hearing Tr. (9/20/2018) at 10:46 a.m.  Defendant was never charged with Driving Under

4  the Influence.  Hearing Tr. (9/20/2018) at 10:51 a.m.

5    **B.    Testimony of Officer Childers**

6    On December 5, 2016, Las Vegas Metropolitan Police Officer Brennan Childers was

7  dispatched to the scene of a vehicle that was idling in the middle of an intersection with a driver

8  who may be asleep.  Hearing Tr. (9/20/2018) at 10:59 a.m., 1:17 p.m.  Officer Childers arrived on

9  the scene at 6:12 a.m. Hearing Tr. (9/20/2018) at 11:35 a.m., 1:18 p.m.  Officer Childers arrived

10  on the scene and observed Defendant's vehicle in the intersection of Flamingo and Jones.  Hearing

11  Tr. (9/20/2018) at 11:00 a.m.  It was cold outside and the windows of the vehicle were up.  Hearing

12  Tr. (9/20/2018) at 1:18 p.m.  The vehicle was in drive and Defendant was asleep behind the wheel.

13  Hearing Tr. (9/20/2018) at 11:01 a.m.  It is not uncommon for people to fall asleep at stop lights

14  in Las Vegas. Hearing Tr. (9/20/2018) at 1:19 p.m.

15    Officer Childers parked his vehicle nose-to-nose with Defendant's vehicle.  Hearing Tr.

16  (9/20/2018) at 11:03 a.m.  As the officers approached the vehicle, Officer Childers noticed an odor

17  of marijuana coming from the vehicle.  Hearing Tr. (9/20/2018) at 11:04 a.m., 11:06 a.m., 1:18

18  p.m.  Officers woke Defendant up; when Defendant rolled his window down, he was disoriented

19  and confused and it took him some time to put his car in park.  Hearing Tr. (9/20/2018) at 11:06

20  a.m., 1:18 p.m.  On Defendant's chest, stuck to his sweatshirt, were wet red pills.   Hearing Tr.

21  (9/20/2018) at 11:06 a.m.  The pills were later determined to be "Advil or one of those types of

22  non-narcotic pills."  Hearing Tr. (9/20/2018) at 1:19 p.m.

23

Defendant said that he had not been drinking, and turned his vehicle off at the officer's direction. Hearing Tr. (9/20/2018) at 11:07 a.m.  Officer Childers then directed Defendant to grab his identification and step out of his vehicle. Hearing Tr. (9/20/2018) at 11:07 a.m.  Officer Childers was concerned that Defendant was impaired, because of the odor of marijuana, as well as the facts that the vehicle was in the middle of the street, Defendant was asleep at the wheel, and he had unknown pills stuck to his sweatshirt.  Hearing Tr. (9/20/2018) at 11:09 a.m.  The pills appeared wet, as if they had come out of Defendant's mouth.  Hearing Tr. (9/20/2018) at 11:09 a.m.  Further, Defendant was somewhat disoriented – he did not know where his driver's license was.  Hearing Tr. (9/20/2018) at 11:09 a.m.  Officer Childers considered all of these to be articulable facts that gave him the ability to remove Defendant from the vehicle to begin sobriety testing.  Hearing Tr. (9/20/2018) at 11:10 a.m.

After removing Defendant from his vehicle, about three minutes into the stop, Officer Childers engaged in conversation with him.  Hearing Tr. (9/20/2018) at 1:19 p.m.  Officer Childers asked Defendant if he had been smoking, and Defendant said he had not been smoking that day. Hearing Tr. (9/20/2018) at 1:19 p.m.  During this conversation, Defendant did not lean on his vehicle, he did not stumble, he did not fall, his speech was not slurred, and his answers to the officer's questions were responsive and coherent. Hearing Tr. (9/20/2018) at 1:19 – 1:20 p.m. Defendant's demeanor became more coherent throughout the stop, which could have been a result of him becoming more awake.  Hearing Tr. (9/20/2018) at 1:20 – 1:21 p.m.  Officer Childers did not pat Defendant down until about 9 or 10 minutes into the stop, just prior to administering the field sobriety tests.  Hearing Tr. (9/20/2018) at 1:22 p.m.

At 6:21 a.m., the CAD shows that Officer Childers was on scene with a male who was possibly under the influence of marijuana. Hearing Tr. (9/20/2018) at 11:33 a.m.  This entry was

made based upon a call into dispatch made by Officer Childers.  Hearing Tr. (9/20/2018) at 11:33 a.m.

At approximately 6:23 a.m., about 11 minutes into the stop, Officer Childers explained to Defendant that he was going to administer field sobriety tests to determine whether he was impaired, and how he would evaluate the tests.  Hearing Tr. (9/20/2018) at 11:11 a.m., 1:23 – 1:24 p.m.  Since it was so cold outside, Officer Childers allowed Defendant to keep his hands in his pockets, which he would not normally do.  Hearing Tr. (9/20/2018) at 11:11 a.m., 1:18 p.m.  Officer Childers conducted a horizontal gaze nystagmus test.  Hearing Tr. (9/20/2018) at 11:12 – 11:14 a.m.  The purpose of that test is to determine if Defendant has alcohol in his system.  Hearing Tr. (9/20/2018) at 11:14 a.m.  Defendant passed the horizontal gaze nystagmus test.  Hearing Tr. (9/20/2018) at 11:16 a.m., 1:24 p.m.  Officer Childers also conducted the walk and turn field sobriety test, which is a test that is to determine impairment.  Hearing Tr. (9/20/2018) at 11:16 – 11:18 a.m.  Defendant failed this test, though Officer Childers could not recall exactly which clues – or how many – he failed.   Hearing Tr. (9/20/2018) at 11:19 a.m., 1:24 p.m.  Finally, Officer Childers conducted the one-leg stand field sobriety test, which also demonstrates clues of impairment.  Hearing Tr. (9/20/2018) at 11:19 – 11:21 a.m.  Defendant failed this test as well.  Hearing Tr. (9/20/2018) at 11:22 a.m., 1:26 p.m.  The field sobriety tests were completed about 15 minutes after the stop began, or at about 6:27 or 6:28 a.m.  Hearing Tr. (9/20/2018) at 1:26 – 1:27 p.m.  Officer Childers did not administer any other tests to Defendant. Hearing Tr. (9/20/2018) at 1:35 p.m.

During the time Officer Childers conducted the field sobriety tests, Officer Hinkel searched Defendant's vehicle and recovered certain items, including a firearm, a half-empty bottle of alcohol, and a bottle of crushed pills.  Hearing Tr. (9/20/2018) at 11:23 - 11:24 a.m., 11:38 a.m.,

1  1:21 p.m.  At this point, officers did not know who Defendant was, and did not know whether the

2  firearm was stolen.  Hearing Tr. (9/20/2018) at 1:21 p.m.  Officers had no reason, at this time, to

3  believe Defendant was a convicted felon.   Hearing Tr. (9/20/2018) at 1:21 p.m.

4       After Officer Childers finished administering the field sobriety tests to Defendant, he

5  approached Officer Hinkel's vehicle and the two engaged in a conversation.   Hearing Tr.

6  (9/20/2018) at 11:24 a.m., 1:28 p.m.  Officer Childers told Officer Hinkel that "this is not an under

7  the influence possession-type thing."  Hearing Tr. (9/20/2018) at 11:24 a.m.   Officer Childers

8  testified that he was trying to determine whether they were able to establish the crime of possessing

9  a firearm while under the influence based on the facts before them.   Hearing Tr. (9/20/2018) at

10  11:24 – 11:25 a.m.  According to Officer Childers, he and Officer Hinkel were "going back and

11  forth" to determine if they had enough for that charge, and eventually decided that they did not, as

12  the firearm was in the back seat of the vehicle.   Hearing Tr. (9/20/2018) at 11:25 a.m.

13       Officer Childers testified that Defendant failed two of the three field sobriety tests, but did

14  not have any clues of impairment.  Hearing Tr. (9/20/2018) at 11:26 a.m.  Nonetheless, Officer

15  Childers testified, Defendant appeared impaired, but did not have horizontal gaze nystagmus.

16  Hearing Tr. (9/20/2018) at 11:26 a.m.  Officer Childers, at that point in his career, had been a

17  police officer for approximately 16 months and had investigated approximately 13 - 14 DUI cases,

18  but had never needed to call a DRE to the scene.[2]   Hearing Tr. (9/20/2018) at 11:26 – 11:27 a.m.,

19  1:17 p.m., 1:49 p.m.  At that point, Officer Childers testified, he had not determined that Defendant

20  was not impaired.   Hearing Tr. (9/20/2018) at 11:27 a.m., 1:35 – 1:37 p.m.  Officer Childers

21  _____

22  [2]If an officer needs a DRE on a scene to determine if someone is under the influence of a drug,
   that officer must specifically request a DRE.   Hearing Tr. (9/20/2018) at 10:58 a.m.  As an

23  example, if a person has no clues on the horizontal gaze nystagmus test, but the officer still suspects
   impairment, the officer calls a DRE to administer the drug impairment tests.   Hearing Tr.
   (9/20/2018) at 10:58 a.m.

testified that he wanted to have an expert there to make the determination.  Hearing Tr. (9/20/2018) at 1:37 p.m.

Officers Childers and Hinkel discussed which unit had a DRE, and that the DRE would be en route to their scene once the unit's briefing was over.  Hearing Tr. (9/20/2018) at 11:28 a.m.  Officer Childers told Officer Hinkel that Defendant did not have nystagmus.  Hearing Tr. (9/20/2018) at 11:28 a.m., 1:28 p.m., 1:32 p.m.  He further stated that, although Defendant failed the other two field sobriety tests, it was so cold outside that he (Officer Childers) would probably fail them as well.  Hearing Tr. (9/20/2018) at 11:28 a.m., 1:28 – 1:29 p.m., 1:32 p.m.  In response, Officer Hinkel said, "And you don't even drink or smell like marijuana."  Hearing Tr. (9/20/2018) at 11:28 a.m.

Officer Childers called his sergeant and told him what facts he had gathered, and it was on this phone call that the topic of a DRE came up.  Hearing Tr. (9/20/2018) at 11:27 a.m., 11:30 a.m., 1:51 p.m.  Officer Childers did not turn his bodycam on for the phone call with his sergeant.  Hearing Tr. (9/20/2018) at 11:30 a.m.  He testified that not turning on his bodycam for this conversation was normal, as Metro policy says that officers should turn their camera off for officer-to-officer conversations.  Hearing Tr. (9/20/2018) at 11:30 a.m., 1:35 p.m.  Officer Childers testified that he told his sergeant the facts of the car stop, including that he was not sure Defendant was impaired and needed a DRE.  Hearing Tr. (9/20/2018) at 11:30 a.m.  Officer Childers also testified, however, that calling a DRE was his sergeant's idea, not his.  Hearing Tr. (9/20/2018) at 1:51 – 1:52 p.m.  The sergeant said he would make a phone call and get a DRE on the scene.  Hearing Tr. (9/20/2018) at 11:30 a.m., 1:33 p.m.  At that time, Officer Childers testified, he waited for the DRE to arrive.  Hearing Tr. (9/20/2018) at 11:31 a.m.  Officer Childers further testified

1  that, since his supervisor asked the DRE to come to the scene as a favor to him (the supervisor), it

2  was worth waiting for the DRE.   Hearing Tr. (9/20/2018) at 1:52 p.m.

3        At approximately 6:40 a.m., Officer Hinkel said that he could not find Defendant's

4  identification in his vehicle.  Hearing Tr. (9/20/2018) at 11:38 a.m.  At that time, Officer Childers

5  asked Defendant for his name and date of birth.  Hearing Tr. (9/20/2018) at 11:39 a.m.  Normally,

6  the backup officer is the person who determines identifiers and runs a defendant on the scene.

7  Hearing Tr. (9/20/2018) at 11:39 a.m.  Once Officer Childers had Defendant's identifiers, he ran

8  him.  Hearing Tr. (9/20/2018) at 11:40 a.m.  At 6:43 or 6:44 a.m., Officer Childers ran Defendant

9  through SCOPE and Triple I, and learned that he had a prior felony conviction.   Hearing Tr.

10  (9/20/2018) at 11:42 – 11:43 a.m.  Because of Defendant's felony, he was prohibited from

11  possessing a firearm.  Hearing Tr. (9/20/2018) at 11:43 a.m.

12        The CAD does not show when the DRE was called.  Hearing Tr. (9/20/2018) at 1:33 p.m.

13  The CAD shows, however, that the DRE was en route to the scene at 6:46 a.m.   Hearing Tr.

14  (9/20/2018) at 1:33 p.m.  The CAD further shows that, at 6:49 a.m., Officer Childers disregarded

15  the DRE.  Hearing Tr. (9/20/2018) at 11:48 a.m.  Officer Childers did so because he booked

16  Defendant on the felony charge of felon in possession of a firearm.  Hearing Tr. (9/20/2018) at

17  11:49 a.m.  Defendant was arrested and, at 6:55 a.m., a search incident to arrest was conducted.

18  Hearing Tr. (9/20/2018) at 11:49 – 11:50 a.m.

19        Prior to handcuffing Defendant, Officer Childers told him that, "you do not seem

20  impaired."  Hearing Tr. (9/20/2018) at 1:47 p.m.  Officer Childers testified that he said this to

21  Defendant despite the fact that he was unable at the time to determine whether Defendant was

22  impaired.  Hearing Tr. (9/20/2018) at 1:54 p.m.  Officer Childers also told Defendant, "You kind

23  of messed up on the one-leg thing, but it's cold … out." Hearing Tr. (9/20/2018) at 1:47 p.m.

Finally, Officer Childers told Defendant that, "Your eyes are fine … but my main concern right now is the firearm." Hearing Tr. (9/20/2018) at 1:47 p.m.  Officer Childers testified that, when he speaks to people when he is about to *Mirandize* them, he likes to "downplay things a little bit…" and "make people feel like it's not the crime of the century."  Hearing Tr. (9/20/2018) at 1:54 p.m.

At 7:34 a.m., Officer Childers made a call into dispatch and said

> I CONDUCTED SSFT[]S ON THE SUBJECT, WHO HAD ZERO CLUES ON HGN.  I HAD REQUESTED A UNIT THAT WAS DRE CERTIFIED, HOWEVER, I BELIEVED THAT MY ORIGINAL SSFT[]S SUFFICIENTLY LEAD ME TO BELIEVE THAT THE DRIVER WAS NOT UNDER THE INFLUENCE, DESPITE THE ODOR OF MARIJUANA UPON OUR APPROACH.  A TOM UNIT WAS ASSIGNED, BUT I DISREGARDED HIM.  HOWEVER, UPON OUR PC SEARCH YIELDING THE FIREARM, I CHOSE TO PLACE HYLTON UNDER ARREST FOR EX-FELON IN POSS OF F/A[.]

Hearing Tr. (9/20/2018) at 1:37 – 1:38 p.m.  *See also* Hearing Exhibit 502.  This statement is exactly the opposite of Childers' testimony before the Court.  Hearing Tr. (9/20/2018) at 1:37 p.m. Officer Childers called into dispatch after Defendant was transported and made this statement, which the dispatch operator transcribed and input into the CAD for the event.   Hearing Tr. (9/20/2018) at 1:38 p.m.

Officer Childers testified that the call is his way of explaining his actions, due to the policy in his department for mandatory arrest of a person driving under the influence.  Hearing Tr. (9/20/2018) at 1:38 p.m.  Officer Childers had decided on the scene to arrest Defendant for the felony offense rather than use the limited resource of the DRE[3] to determine if Defendant was impaired.   Hearing Tr. (9/20/2018) at 1:39 p.m.  Officer Childers testified that day shift briefing starts at 6:30 a.m. and lasts about a half hour.  Hearing Tr. (9/20/2018) at 1:51 p.m.  As a result,

---

[3] Out of approximately 2,000 police officers in Metro, Officer Childers estimates that less than 100 are DRE-certified.  Hearing Tr. (9/20/2018) at 1:50 p.m.

he knew that it would take a long time for the DRE to arrive on the scene. Hearing Tr. (9/20/2018) at 1:51 p.m. In addition, the prosecutorial merit of a DUI is time-sensitive – officers have only a limited period of time between operation of the vehicle and obtaining breath or blood samples. Hearing Tr. (9/20/2018) at 1:51 p.m.

Officer Childers made the 7:34 statement to dispatch to explain why he violated policy, though he now realizes it was something he should not have done. Hearing Tr. (9/20/2018) at 1:39 p.m. Officer Childers was concerned about the opinion of his sergeant, who was the one who had called the DRE to the scene. Hearing Tr. (9/20/2018) at 1:41 p.m. Officer Childers "kind of needed to appease" his sergeant and "did not want to be looked upon negatively" by him for disregarding the DRE and cutting the DUI investigation short. Hearing Tr. (9/20/2018) at 1:41 p.m. Officer Childers testified that many officers, when they have a DUI, do not want to "deal with" all of the paperwork that comes with processing a DUI, so they find a different crime and book on that crime instead. Hearing Tr. (9/20/2018) at 1:41 p.m. These officers will "unfortunately, neglect the DUI, and I didn't want to be seen as doing that, because I'm pretty passionate about DUIs." Hearing Tr. (9/20/2018) at 1:41 p.m. Officer Childers made this statement because he did not want it to seem as if he did not do his due diligence on the scene regarding the DUI. Hearing Tr. (9/20/2018) at 2:01 – 2:02 p.m. Officer Childers called into dispatch and made the 7:34 statement to justify his actions in disregarding the DRE and cutting short the DUI investigation. Hearing Tr. (9/20/2018) at 1:42 p.m. Officer Childers did not tell dispatch that he disregarded the DUI in favor of the felony because, "per policy, I have to see my DUI investigation through, and I decided to cut it short because I didn't want to have to wait for this other resource." Hearing Tr. (9/20/2018) at 1:42 p.m. Officer Childers gave inaccurate information to dispatch in order to appease his sergeant. Hearing Tr. (9/20/2018) at 1:42 – 1:44

p.m., 1:56 p.m.  Officer Childers testified that he made the statement so that either his supervisor or the traffic unit supervisor would see it if either one had any questions about why he called off the DRE. Hearing Tr. (9/20/2018) at 2:02 p.m.

## III.    ANALYSIS

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).  In Fourth Amendment terms, a traffic stop entails a seizure of the driver "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653,(1979); *see also Whren v. United States*, 517 U.S. 806, 809-810 (1996).

In the context of an investigatory traffic stop, an officer need only have reasonable suspicion to justify the seizure.  *See United States v. Lopez–Soto,* 205 F.3d 1101, 1104–05 (9th Cir. 2000) (*Whren* did not alter the well-settled law that reasonable suspicion is enough to support an investigatory traffic stop under the Fourth Amendment); *Brendlin v. California,* 551 U.S. 249, 263 (2007) (seizure began at the moment the car came to a halt on the side of the road).  Reasonable suspicion requires "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in [a traffic violation]." *United States v. Michael R.,* 90 F.3d 340, 346 (9th Cir. 1996) (quoting *United States v. Garcia–Camacho,* 53 F.3d 244, 246 (9th Cir. 1995)).

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015). But an officer's authority for such a seizure ends "when tasks tied to the traffic infraction are—or reasonably should have been—

16

completed." *Id*. The duration of a traffic stop shall not exceed the time needed to complete "the seizure's mission, [which is] to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id*. (internal citations and quotation marks omitted).

The reasonableness of a traffic stop is determined by its mission "to address the traffic violation that warranted the stop." *Id*. Investigatory actions and their attendant safety precautions must be justified by a reasonable articulable suspicion that the seized individual is engaged in criminal activity when they expand the scope of a seizure by prolonging a traffic stop. *See id*. at 1615 ("An officer ... may conduct certain unrelated checks during an otherwise lawful traffic stop. But ... he may not do so in a way that prolongs the stop, absent reasonable suspicion ordinarily demanded to justify detaining an individual."). An officer may extend a traffic stop if the extension itself is independently supported by reasonable suspicion. *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015) (internal citation omitted). The extension of a traffic stop requires the officer to be "aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *Id*. (internal quotation omitted).

"In assessing whether a detention is too long in duration to be justified as an investigative stop," it is proper "to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe,* 470 U.S. 675, 686, (1985). "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Evans*, 786 F.3d at 784 (quoting *Illinois v. Caballes,* 543 U.S. 405, 407 (2005)). In particular, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* Ultimately, the analysis remains one of reasonableness, and thus the Court must examine the "totality of the

17

1   circumstances" surrounding the stop to determine whether the length is reasonable. *See United*

2   *States v. Turvin,* 517 F.3d 1097, 1101 (9th Cir. 2008).

3           The exclusionary rule encompasses "evidence seized during an unlawful search," as well

4   as the "indirect ... products of such invasions." *Wong Sun v. United States*, 371 U.S. 471, 484

5   (1963). Evidence derivative of a Fourth Amendment violation—the so-called "fruit of the

6   poisonous tree," *id.* at 488 —is ordinarily "tainted" by the prior "illegality" and thus inadmissible,

7   subject to a few recognized exceptions. *United States v. Gorman*, 859 F.3d 706, 716 (9th Cir.),

8   order corrected, 870 F.3d 963 (9th Cir. 2017) (quoting *United States v. Washington*, 490 F.3d 765,

9   774 (9th Cir. 2007).

10          Judge McKibben granted Defendant's motion at Docket No. 124 for the limited purpose of

11  conducting an evidentiary hearing before the undersigned, "solely on the issue of the time frame

12  of the detention of the Defendant after he was discovered in the Las Vegas intersection." Docket

13  No. 136. Specifically, Judge McKibben ordered that the hearing would be limited to the duration

14  of the detention and, based upon the facts generated as a result of the CAD, whether that period of

15  time was reasonable. *Id*. Therefore, the Court must now determine, in light of the facts generated

16  as a result of the CAD and the evidentiary hearing, whether "there was independent reasonable

17  suspicion justifying each prolongation" after the completion of the Field Sobriety Tests.[4] *See*

18  *United States v. Evans*, 122 F.Supp.3d 1027, 1033 (D.Nev. 2015).

19          The evidentiary hearing shed new light both on the facts in the CAD and Officer Childer's

20  actions. Officer Childers testified that he believed Defendant may have been impaired until the

21  time he arrested him for the felony gun charge; however, the facts in the CAD contradict his

22

23

---

[4] Defendant agrees that the officers reasonably detained him until the completion of the Field
Sobriety Tests. Docket No. 124 at 5.

testimony.  Officer Childers' statement in the CAD demonstrates that, after the Field Sobriety Tests, Officer Childers no longer believed that Defendant was impaired.  In combination with the video and Officer Hinkel's testimony, the Court finds that the mission of the stop ended after the officers' conversation regarding the Field Sobriety Tests.  At that point, in Officer Hinkel's words, the officers were "leaning toward the belief" that Defendant was not impaired.  Officer Hinkel's testimony, combined with Officer Childers' statement in the CAD, convince the Court that the mission of the stop ended at that point.  Although Officer Childers attempts to explain away the statement he made in the CAD by claiming it was a false statement meant to cover his actions in failing to see the DUI investigation through and in calling off the DRE, the Court finds the video and Officer Hinkel's testimony compelling in determining that the officers no longer believed Defendant was impaired.  Therefore, the Court finds that the mission of the stop ended at the discussion between Officers Hinkel and Childers, immediately after the administration of the Field Sobriety Tests.

The more difficult question before the Court is the consequence of this determination. Defendant asks the Court to suppress the information derived from the running of his criminal record, but provides no authority in support of his request.  The United States asks the Court to suppress only the statements made by Defendant after the prolongation of the stop, as the firearm was seized prior to the prolongation of the stop and Defendant's identity – and, presumably, his criminal record - cannot be suppressed.

Defendant submits no caselaw that supports his request for suppression of his criminal record, and the Court could find none in its own research.  Rather, the relevant cases tend to suppress searches and/or statements that occurred after the mission of the stop was exceeded.  *See United States v. Wrobel*, 295 F.Supp.3d 1127 (D.Idaho 2018) (where officer unreasonably

prolonged stop, he lacked probable cause to search Defendant's vehicle during prolongation of stop; therefore, drugs seized during search suppressed); *United States v. Cornejo*, 196 F.Supp.3d 1137, 1158 (E.D. Cal. 2016) (evidence and statements suppressed after prolongation of stop where officers delayed traffic stop to "fish" for evidence of criminal activity "based on a hunch or a broadly generalized profile); *United States v. Abarza*, 143 F.Supp.3d 1082 (D.Or. 2015) (troopers lacked reasonable suspicion to extend stop and, therefore, items seized from search of vehicle during prolongation suppressed); *Evans*, *supra* (law enforcement exceeded the mission of traffic stop and unreasonably prolonged stop to bring canine for sniff; therefore, drugs seized from subsequent search of vehicle suppressed).

Further, the caselaw indicates that record checks of the person detained in a traffic stop are properly conducted. When stopping an individual for a minor traffic violation, "an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez*, 135 S.Ct. at 1615 (alteration in original) (internal quotation omitted). "[S]uch inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," as these checks are aimed at "ensuring that vehicles on the road are operated safely and responsibly." *Id. See Evans*, 786 F.3d at 786. *See also United States v. Munoz*, 590 F.3d 916, 920–21 (8th Cir. 2010) ("[A]fter making a traffic stop, an officer may detain the driver while he completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." (citation and quotation marks omitted)); *Cornejo*, 196 F. Supp. 3d at 1150 (same).

IV.    **CONCLUSION**

Accordingly, for the reasons stated above, the Court **RECOMMENDS** the suppression of any statements made by Defendant after the stop was unreasonably prolonged. *See Cornejo*, 196 F. Supp. 3d at 1158. As the firearm was recovered prior to the prolongation and the caselaw expressly allows the running of a criminal record, the Court does not recommend suppression of either the firearm or the running of Defendant's record.

IT IS SO ORDERED.

DATED: November 1, 2018.

NANCY J. KOPPE
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days of service of this document.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This Circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).